№ 14-7014

_____

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

## LOUIS P. CANNON, *et al*.

*Appellants*

v.

## DISTRICT OF COLUMBIA

*Appellee*

_____

## APPELLANTS' OPENING BRIEF

_____

Matthew August LeFande
Attorney at Law PLLC
DC Bar #475995
4585 North 25th Road
Arlington VA 22207
Tel: (202) 657-5800
Fax: (202) 318-8019
email: matt@lefande.com
Attorney for Appellants

## Certificate as to Parties, Rulings and Related Cases

**(A) Parties and Amici.**

There are no corporate parties to this appeal.

The Appellants were represented before the District Court and in the prior appeal by Matthew LeFande of Arlington, Virginia.

The Defendant District of Columbia was represented by its Attorney General.

**(B) Rulings Under Review.**

The Appellants appeal the District Court Judge Ellen Huvelle's January 6, 2014 summary dismissal of their claims. ECF Docket # 57, 58. 2014 U.S. Dist. LEXIS 726. J.A. 98.

**(C) Related Cases.**

*Cannon v. District of Columbia*, 717 F.3d 200 (D.C. Cir. 2013), the prior appeal in this case.

## Table of contents

I.     Certificate as to Parties, Rulings, and Related Cases............................i

II.    Table of Authorities..............................................................................iii

III.   Introduction........................................................................................1

IV.    Statement of Jurisdiction.....................................................................2

V.     Statement of Facts...............................................................................2

VI.    Summary of the Argument...................................................................7

VII.   Argument.............................................................................................9

    1.     Standard of Review.................................................................9

    2.     The District of Columbia's offset of the Appellants' salaries violated the Public Salary Tax Act...........................................10

    3.     This Court has never opined as to whether D.C. Code § 5-723(e) was applicable to these Appellants where they were entitled to pensions prior to 1979, or as to whether subsequent enactments superseded the offset provision............................16

    4.     The District of Columbia has taken private property for public use without due process or just compensation in violation of the Fifth Amendment....................................................................21

      a.   The District of Columbia took the Appellants' retirement benefits without lawful authority...............................22

      b.   The District of Columbia took the retirement benefits without any kind of meaningful pre-deprivation due process...............24

      c.   The Appellants had no administrative remedy.........................27

5.      There is indisputable Federal Question jurisdiction herein......33

VIII.  Conclusion .........................................................................................40

Addendum of Statutes

Certificate of Compliance with Rule 32(a)

Certificate of Service

## II.    Table of Authorities

## Cases

*Anderson v. Liberty Lobby, Inc.,*
     477 U.S. 242 (1986)..........................................................................10

*Armstrong v. Manzo,*
     380 U.S. 545 (1965)....................................................................25-26

*Armstrong v. United States,*
     364 U.S. 40 (1960).............................................................................22

*Banner v. United States*,
     428 F.3d 303 (D.C. Cir. 2005).....................................................34-35

*Barksdale v. Wash. Metro. Area Transit Auth.,*
     512 F.3d 712 (D.C. Cir. 2008).....................................................38-39

*Barlow & Haun, Inc. v. United States,*
     87 Fed. Cl. 428 (2009)......................................................................21

*Bishop v. District of Columbia,*
     411 A.2d 997 (D.C. 1980)................................................................32

*Board of Regents v. Roth,*
     408 U.S. 564 (1972)....................................................................24-25

*Bolling v. Sharpe,*
     347 U.S. 497 (1954).........................................................................24

*Bowen v. Public Agencies Opposed to Social Security Entrapment,*
     477 U.S. 41 (1986)...........................................................................21

*Brown v. Valoff,*
     422 F.3d 926 (9th Cir. 2005)............................................................29

*Buse Timber & Sales, Inc. v. United States,*
     45 Fed. Cl. 258 (1999).....................................................................21

\* Authorities marked with an asterisk are those upon which we chiefly rely.

*Cannon v. District of Columbia*,
  717 F.3d 200 (D.C. Cir. 2013)....................................................6-7, 10

*Carnegie-Mellon Univ. v. Cohill*,
  484 U.S. 343 (1988)........................................................38

*Castle v. United States*,
  48 Fed. Cl. 187 (2000)......................................................22

*Chicago v. Int'l Coll. of Surgeons*,
  522 U.S. 156 (1997)........................................................37

*Chicot County v. Sherwood*,
  148 U.S. 529 (1893)........................................................38

*CIGNA Corp. v. Amara*,
  131 S. Ct. 1866 (2011)......................................................20

*Clark v. United States*,
  691 F. 2d 837 (7th Cir. 1982)..............................................15

*Cohens v. Virginia*,
  19 U.S. 264 (1821)..........................................................20

*Collector v. Day*,
  78 U.S. 113 (1871)..........................................................14

*Confederated Salish & Kootenai Tribes etc. v. Moe*,
  392 F. Supp. 1297 (D. Mont. 1974)........................................34

*Convention Center Referendum Committee v. District of Columbia Bd. of Elections & Ethics*,
  441 A.2d 889 (D.C. 1981)..................................................32

*Council of the Dist. of Columbia v. Gray*,
  14-cv-655 (EGS) (D.D.C. May 19, 2014)..................................9

*CSX Transp., Inc. v. Ala. Dep't of Revenue*,
  131 S. Ct. 1101 (2011)......................................................13

*\* Authorities marked with an asterisk are those upon which we chiefly rely.*

*D'Acquisto v. Washington*,
    640 F. Supp. 594 (N.D. Ill. 1986)........................................................25

\* *Davis v. Michigan Dep't of the Treasury*,
    489 U.S. 803 (1989)......................................................8, 11-12, 14-15

*Detroit Edison Co. v. United States*,
    56 Fed. Cl. 299 (2003)........................................................21

*Detroit v. Murray Corp. of America*,
    355 U.S. 489 (1958)........................................................13

*District of Columbia v. Hunt*,
    520 A.2d 300 (D.C. 1987)........................................................30

*District of Columbia v. Washington Home Ownership Council, Inc.*,
    415 A.2d 1349 (D.C. 1980)........................................................32

*Dobbins v. Commissioners of Erie County*,
    41 U.S. 435 (1842)........................................................14

*Edwards v. Shinseki*,
    582 F.3d 1351 (Fed. Cir. 2009)........................................................25-26

*Estate of Underwood v. National Credit Union Admin.*,
    665 A.2d 621 (D.C. 1995)........................................................27-29

*Executive Software N. Am. v. U.S. Dist. Ct. for the Cent. Dist. of Cal.*,
    24 F.3d 1545 (9th Cir. 1994)........................................................36-37

*Figueroa v. D.C. Metro. Police Dep't*,
    633 F.3d 1129 (D.C. Cir. 2011)........................................................10

*Gilles v. Ware*,
    615 A.2d 533 (D.C. 1992)........................................................30

*Goss v. Lopez*,
    419 U.S. 565 (1975)........................................................25, 26

\* Authorities marked with an asterisk are those upon which we chiefly rely.

*Howard v. Commissioners of Sinking Fund,*
　　344 U.S. 624 (1953)..................................................................13

*Humble Oil & Refining Co. v. Calvert,*
　　464 S.W.2d 170 (Tex. Civ. App. 1971)...............................13

*Humble Oil & Refining Co. v. Calvert*,
　　478 S.W.2d 926, 930 (Tex. 1972)...................................13-14

*Hyde v. Stone,*
　　61 U.S. 170 (1858)..................................................................38

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.,*
　　140 F.3d 442, 448 (2d Cir. 1998)........................................39

\* *Jefferson County v. Acker,*
　　527 U.S. 423 (1999)...............................................................13

*Kaemmerling v. Lappin,*
　　553 F.3d 669 (D.C. Cir. 2008)............................................29

*Key v. Doyle,*
　　434 U.S. 59 (1977).................................................................35

*King v. Kidd,*
　　640 A.2d 656 (D.C. 1993)...............................................27-28

*Kizas v. Webster,*
　　707 F. 2d 524 (D.C. Cir. 1983)...........................................15

*Kuba v. 1-A Agric. Ass'n,*
　　387 F.3d 850, 855-856 (9th Cir. 2004)...............................37

*Lattisaw v. District of Columbia,*
　　905 A.2d 790 (D.C. 2006)....................................................30

*Lindsay v. Gov't Employees. Ins. Co.*,
　　448 F.3d 416 (D.C. Cir. 2006)........................................36-37

\* Authorities marked with an asterisk are those upon which we chiefly rely.

*Logan v. Zimmerman Brush Co.*,
    455 U.S. 422 (1982)......................................................................26-27

*Lynch v. United States*,
    292 U.S. 571 (1934)...........................................................................21

*Mathews v. Eldridge*,
    424 U.S. 319 (1976).......................................................................25-26

*McClellan v. Carland*,
    217 U.S. 268 (1910)...........................................................................38

*McCoy v. Webster*,
    47 F.3d 404 (11th Cir. 1995).............................................................36

*McCulloch v. Maryland*,
    17 U.S. 316 (1819).............................................................................14

*Memphis Light, Gas & Water Div. v. Craft*,
    436 U.S. 1 (1978)..........................................................................24-26

*Mertens v. Hewitt Associates*,
    508 U.S. 248 (1993)...........................................................................20

*Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation*,
    425 U.S. 463 (1976)...........................................................................34

*New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*,
    101 F.3d 1492 (3d Cir. 1996).............................................................36

*Osborn v. Haley*,
    549 U.S. 225 (2007)...........................................................................37

*Parratt v. Taylor*,
    451 U.S. 527 (1981)...........................................................................26

*Perry v. Sindermann*,
    408 U.S. 593 (1972).......................................................................24-25

*\* Authorities marked with an asterisk are those upon which we chiefly rely.*

*Perry v. United States*,
    294 U.S. 330 (1935)..............................................................21

*Phillips Chemical Co. v. Dumas Independent School Dist.*,
    361 U.S. 376 (1960)..............................................................11

*Porter v. Nussle,*
    534 U.S. 516 (2002)..............................................................29

*Portsmouth v. Fred C. Gardner Co.*,
    215 Va. 491 (1975)..........................................................13-14

*Quackenbush v. Allstate Ins. Co.,*
    517 U.S. 706 (1996)..............................................................38

*Qwest Communs. Corp. v. City of Berkeley,*
    146 F. Supp. 2d 1081 (N.D. Cal. 2001).................................34

*Reynolds v. Wagner,*
    936 F. Supp. 1216 (E.D. Pa. 1996)........................................26

*Rivera v. Rochester Genesee Reg'l Transp. Auth.,*
    702 F.3d 685 (2d Cir. 2012)..................................................39

*Swanson v. Powers*,
    937 F.2d 965 (4th Cir. 1991)...............................................8-9

*Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency,*
    535 U.S. 302 (2002)..............................................................21

*Thermtron Prods. v. Hermansdorfer*,
    423 U.S. 336 (1976)..............................................................38

\* *Thomas v. Barry,*
    729 F.2d 1469 (D.C. Cir. 1984).....................................35, 39

*Trailer Marine Transport Corp. v. Rivera Vazquez*,
    977 F.2d 1 (1st Cir. 1992)......................................................34

\* Authorities marked with an asterisk are those upon which we chiefly rely.

*Treglia v. Town of Manlius*,
    313 F.3d 713 (2d Cir. 2002).................................................................39

*Trs. of the Constr. Indus. & Laborers Health & Welfare v. Desert Valley Landscape & Maint., Inc.*,
    333 F.3d 923 (9th Cir. 2003).............................................................37

*United Mine Workers v. Gibbs*,
    383 U.S. 715 (1966)...........................................................................37

*United States v. Lewisburg Area School Dist.*,
    539 F.2d 301 (3d Cir. 1976)..............................................................13

*United States v. Pewee Coal Co.*,
    341 U.S. 114 (1951)...........................................................................21

*Winder v. Erste*,
    566 F.3d 209 (D.C. Cir. 2009)..........................................................10

*Wolff v. McDonnell*,
    418 U.S. 539 (1974)...........................................................................26

*Woodford v. Ngo*,
    548 U.S. 81 (2006).............................................................................29

*Wright v. Riveland*,
    219 F.3d 905 (9th Cir. 2000)............................................................34

*Zucker v. United States*,
    758 F.2d 637 (Fed. Cir. 1985)..........................................................15

\* Authorities marked with an asterisk are those upon which we chiefly rely.

**Statutes**

4 U.S.C. § 110................................................................................................33

4 U.S.C. § 111........................................................................................7, 10, 14

5 U.S.C. § 8331.................................................................................................23

5 U.S.C. § 8339.................................................................................................15

5 U.S.C. § 8344.................................................................................................19

28 U.S.C. § 1291.................................................................................................2

28 U.S.C. § 1367.................................................................7, 36-37, 39

28 U.S.C. § 1447.................................................................................................38


D.C. Code § 1-206.02.................................................................33, 34

D.C. Code § 1-207.13.................................................................30, 31

D.C. Code § 1-611.03.................................................................................................23

D.C. Code § 1-803.01.................................................................................................28

D.C. Code § 1-815.02.................................................................9, 31, 35

D.C. Code § 5-723...........................................7, 16-20, 22-23, 26, 39

**Court Rules**

Fed. R. Civ. P. 56.................................................................................................9

**Legislation**

Pub. L. 93-198.................................................................................................33

Pub. L. 96-122.................................................................................................3, 17

Pub. L. 105-33.................................................................4, 18, 22

PUB. L. 110-161....................................................................................19

D.C. ACT 15-489..............................................................................1, 23


**Other materials**

51 D.C. REG. 8779................................................................................18, 23

U.S. General Accounting Office, DISTRICT PENSIONS: FEDERAL OPTIONS FOR SHARING BURDEN TO FINANCE UNFUNDED LIABILITY (Dec. 1994)....................3

Arthur Anderson & Co, REPORT TO THE U.S. SENATE COMMITTEE ON THE DISTRICT OF COLUMBIA ON THE ACCOUNTING AND FINANCIAL MANAGEMENT PRACTICES OF THE DISTRICT OF COLUMBIA GOVERNMENT (June 1976).............2

BLACK'S LAW DICTIONARY (5TH ED. 2009).......................................................12

BLACK'S LAW DICTIONARY (9th ed. 2009).......................................................12

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1976)....................12-13

## III.    Introduction

Under D.C. Act 15-489, the District of Columbia government must
"treat former District government employees who are federal annuitants the
same as former federal government employees who are federal annuitants by
eliminating the reduction in pay of a former District government employee
who is a reemployed federal annuitant." J.A. 23. In direct conflict with this
law, the District of Columbia relies solely on a vestige of the District of
Columbia Retirement Reform Act of 1979 to offset federal pension
payments to the Appellants from their present salaries, even though the
Appellants are indisputably "former District government employees who are
federal annuitants". The offset of federally funded and administered
annuities in the face of exemption of non-federally funded annuities violates
the Public Salary Tax Act of 1939. The District Court has erred in not
recognizing that it is the ultimate effect of the offset upon the federal
government's fiscal burden, not the mechanism or label of the offset, which
determines the nature of the offset as a tax. Given that the District of
Columbia has violated the Act in the face of Supreme Court controlling
precedent, this Court must now reconsider the other constitutional
implications of the taking of these pensions without lawful justification.

## IV.    Statement of Jurisdiction

On July 6, 2014, the District Court dismissed all of the Appellants'
remaining claims in this case.  J.A. 98.  On February 5, 2014, the Appellants
made a timely Notice of Appeal.  J.A. 116.  28 U.S.C. § 1291 confers
jurisdiction upon the United States Court of Appeals for a final decision of a
District Court.

## V.    Statement of Facts

The District of Columbia Police and Fire Retirement System
("PFRS") was established in 1916 to replace several earlier programs which
provided benefits to District of Columbia police, members of the Secret
Service, and other federal police agencies operating within the District of
Columbia at that time.  At the time of the granting of Home Rule to the
District of Columbia in 1974, there existed enormous problems within
PFRS.  A 1974 study by Arthur Anderson & Co. determined that the
District's existing pension programs had some $2 billion in unfunded
liabilities outstanding.  Arthur Anderson & Co., REPORT TO THE U.S. SENATE
COMMITTEE ON THE DISTRICT OF COLUMBIA ON THE ACCOUNTING AND
FINANCIAL MANAGEMENT PRACTICES OF THE DISTRICT OF COLUMBIA
GOVERNMENT (June 1976), Vol. 1, Exec. Summary at 8.

2

In 1978, Congress passed a bill to provide the District of Columbia with a series of $65 million payments over twenty five years to cover the costs of entitlements of District of Columbia workers who retired prior to Home Rule. U.S. General Accounting Office, DISTRICT PENSIONS: FEDERAL OPTIONS FOR SHARING BURDEN TO FINANCE UNFUNDED LIABILITY (Dec. 1994) (GAO/HEHS-95-40) at 3. This bill was vetoed by President Carter. *Id*. at 17.

By 1979, unfunded liabilities for District of Columbia retirement entitlements had grown to $2.7 billion. Congress and the Carter Administration agreed to a one-time $38 million payment and a series of twenty-five annual payments of $52 million which was intended to cover 80 percent of the projected retirement benefits and some of the disability benefits of pre-Home Rule retirees. District of Columbia Retirement Reform Act of 1979, PUB. L. 96-122.

Following passage of the District of Columbia Retirement Reform Act of 1979, the District of Columbia's required contributions tripled and the District's inherited liabilities increased. The District of Columbia eventually suspended payments to these pension programs and the District was subsequently sued to restore payments to the retirement programs. As it became clear in the mid 1990's that the existing regime to fund District of

Columbia pensions was untenable, Congress again moved to reform or take over District of Columbia programs including pension programs. The District of Columbia Retirement Protection Act, Title XI, Subtitle A of the Balanced Budget Act of 1997, PUB. L. 105-33, became effective in October of 1997. Of $3.9 billion in existing annuity assets in the possession of the District of Columbia to fund pension programs, $2.6 billion was sent to a new Federal Trust Fund. PUB. L. 105-33, Sec. 11033. A second fund was also created, to be funded from future federal appropriations to pay benefits after the funds of the first fund were depleted. *Id*., Sec. 11051.

All responsibility for payments of District of Columbia employees who retired before June 30, 1997 was transferred to the federal government. The Act split responsibility for administration and payment for existing District of Columbia employees between the federal government and the District of Columbia. The federal government, through the Department of the Treasury, was, and is today, responsible for payment of benefits accrued by District of Columbia employees prior to June 30, 1997 and the District of Columbia pays and administers benefits accrued to District employees after that date.

Each of the named Appellants was first employed by the District of Columbia government as a police officer prior to October 1, 1987 and retired

from the District of Columbia government. Each Appellant receives federal annuity retirement benefits as described herein for their creditable service on or prior to June 30, 1997. At various times starting in 2008, the Appellants became reemployed by the District of Columbia, as administrators and supervisors of the Protective Services Police Department, a small police department charged with protection of District of Columbia buildings, a similar mission to that of the Federal Protective Service.

Starting with the pay period January 1-14, 2012, the District of Columbia offset the salaries of each of the Appellants by the amount of their retirement benefit annuity payments. Certain other persons similarly retired from the Metropolitan Police Department were subsequently rehired by the District of Columbia and returned back to duties at the Metropolitan Police Department. However, nearly simultaneous to the offset of their salaries in the manner that the Appellants' salaries were offset, these persons received raises solely for the purpose of offsetting the offset imposed, thus negating the effect of the offset on these persons.

After receiving their pay statements for the January 1-14, 2012, the Appellants filed suit, pleading a class action, but later requesting leave to not move for class certification until after the dispositive motions were decided. ECF Docket # 24 at 4. The District Court denied the Appellants'

applications for emergency injunctive relief and on February 8, 2012, the

Appellants filed their First Amended Complaint.  ECF Docket # 10.  On that

date, the District of Columbia terminated Appellant Louis Cannon from his

position as Chief of the Protective Services Police Department, employing a

bizarre claim that a police report from October 2011, which he did not write,

contained false information.  The Appellants also discovered that none of

them received their pay for the second pay period of January 2012 whereas

all other agency employees did.  The Appellants filed a Supplemental

Complaint, asserting new First Amendment retaliation claims and moved

again for a Preliminary Injunction.  J.A. 48, ECF Docket # 11, 12.

Prior to discovery, the District of Columbia moved to dismiss and for

summary judgment.  ECF Docket # 18.  The Appellants made a cross

motion for partial summary judgment.  ECF Docket # 30.  On July 6, 2012,

the District Court granted summary judgment for the District of Columbia

on all federal claims.  J.A. 72.  The Appellants filed a timely Notice of

Appeal.  J.A. 97.

This Court reversed and remanded the case to the District Court,

finding the offsets violated the Fair Labor Standards Act, acknowledging

some Appellants received less than the federal minimum wage as pay for

work performed.  *Cannon v. District of Columbia*, 717 F.3d 200 (D.C. Cir.

2013).  On remand, the District of Columbia paid the Appellants' FLSA claims, and then asserted the District Court no longer had supplemental or federal question jurisdiction over the Appellants' remaining claims.   In moving to dismiss, the District of Columbia made no allegation of any of the circumstances enumerated under 28 U.S.C. § 1367(c).

On January 6, 2014, the District Court again summarily dismissed the Appellants' claims, cursorily asserting the offset was not a tax, much in the same tenor as it previously cursorily dismissed the Appellants' FLSA claims. J.A. 98.  "D.C. law claims 'substantially predominate[] over the claim or claims over which the district court has original jurisdiction.'"  J.A. 113. (quoting 28 U.S.C. § 1367(c)(2)).  The Appellants timely appealed.  J.A. 116.  Nearly all, if not all, of the reemployed annuitants affected by the offset have since left employment of the District of Columbia, constructively terminated by a lack of pay.

## VI.    Summary of the Argument

D.C. Code § 5-723(e) is the sole remaining vestige of the District of Columbia Retirement Reform Act of 1979.  The offset provision of § 5-723(e) reflects a time when Congress authorized and funded the District of Columbia to pay pre-1979 retirement benefits to its police and fire retirees.

The subsequent enactment of the District of Columbia Retirement Protection Act in 1997, stripped away any obligation for the District of Columbia to pay pre-1997 benefits to these retirees.  By legislative inadvertence, § 5-723(e) remained on the books, improperly authorizing the District of Columbia to offset retirement benefits now paid directly by the United States Treasury to these retirees.   The language of the 1979 Act is wholly inapplicable to the Appellants, both for annuities which the District of Columbia does not pay, and by the very language of the Act exempting pre-1979 employees.

The present procedural posture of this case is particularly curious, given that there appears to be a controlling Supreme Court case on point holding directly to the contrary of the District Court's dismissal of the Appellants' Public Salary Tax Act claims and a statute specifically designating venue to the District Court.

On March 28, 1989, the United States Supreme Court reversed a decision of the Michigan Court of Appeals and declared unconstitutional a Michigan taxation scheme that was similar to North Carolina's in that it granted state income tax exemptions to retired state employees, but not to either federal or private retirees. See *Davis v. Michigan Dep't of the Treasury*, 489 U.S. 803 (1989).  The Court held that such a tax system discriminated against the federal government and thus violated the constitutional doctrine of intergovernmental tax immunity as well as the Public Salary Tax Act of 1939, codified, as amended, at 4 U.S.C. § 111.

*Swanson v. Powers*, 937 F.2d 965, 966-967 (4th Cir. 1991) (parallel citations omitted).

The District Court's dismissal of what it characterized as predominating District of Columbia law claims was particularly disingenuous where such claims were inextricably related to Congressional enactments, which themselves highlighted the tortured history of Home Rule in the District of Columbia.  "The District has had a measure of control over its own affairs since the enactment of the Home Rule Act in 1973, and has been fighting — *unsuccessfully* — for budget autonomy ever since." *Council of the Dist. of Columbia v. Gray*, 14-cv-655 (EGS) at 2 (D.D.C. May 19, 2014) (emphasis in original).  Despite even an express venue provision in the 1997 Act to the contrary, D.C. Code § 1-815.02(a), the District Court somehow could not find the remaining issues herein to implicate its federal question jurisdiction.

## VII.  Argument

## 1.    Standard of Review

Summary judgment is appropriate when the "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" FED. R. CIV. P. 56(a).  A fact is material if it

"might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  This Court reviews the District Court's conclusions of law *de novo*.  *Cannon*, 717 F.3d at 204 (citing *Figueroa v. D.C. Metro. Police Dep't*, 633 F.3d 1129, 1131 (D.C. Cir. 2011); *Winder v. Erste*, 566 F.3d 209, 213 (D.C. Cir. 2009)).

**2.     The District of Columbia's offset of the Appellants' salaries violated the Public Salary Tax Act.**

The District Court cursorily dismissed the Appellants' assertion that the offset imposed upon them is a tax on their pension benefits, nearly parroting its failed argument that such offset did not violate the Fair Labor Standards Act by improperly blurring the distinction between salaries for work performed and existing entitlements.

> The United States consents to the taxation of pay or compensation for personal service as an officer or employee of the United States, a territory or possession or political subdivision thereof, the government of the District of Columbia, or an agency or instrumentality of one or more of the foregoing, by a duly constituted taxing authority having jurisdiction, if the taxation does not discriminate against the officer or employee because of the source of the pay or compensation.

4 U.S.C. § 111 (a).

Plaintiffs explicitly recognize as much in their Opposition when they state that the District has no means of actually taxing plaintiffs' annuity benefits, "since such benefits are paid directly by the United States Treasury." (Opp. at 17.) This conclusion is further supported by the fact that plaintiffs are entitled to one hundred percent of their pension benefits regardless of whether they are rehired by the District. To be sure, the question of whether the District is entitled to withhold parts of plaintiffs' DGS salaries is important for the adjudication of plaintiffs' other legal claims, however, because plaintiffs' pension benefits were never reduced, they cannot constitute a tax in violation of the Public Tax Act.

*Cannon v. Dist. of Columbia*, 12-CV-0133 ESH at 15 (D.D.C. Jan. 6, 2014).

J.A. 112.

The District Court's distinction between taxes directly upon pensions and taxes upon salaries because of preexisting pensions has been categorically refuted by the Supreme Court.

The dissent argues that this tax is nondiscriminatory, and thus constitutional, because it "draws no distinction between the federal employees or retirees and the vast majority of voters in the State." *Post*, at 823. In [*Phillips Chemical Co. v. Dumas Independent School Dist.*, 361 U.S. 376 (1960)], however, we faced that precise situation: an equal tax burden was imposed on lessees of private, tax-exempt property and lessees of federal property, while lessees of state property paid a lesser tax, or in some circumstances none at all. Although we concluded that "[u]nder these circumstances, there appears to be no discrimination between the Government's lessees and lessees of private property," 361 U.S., at 381, we nonetheless invalidated the State's tax. This result is consistent with the underlying rationale for the doctrine of intergovernmental tax immunity. The danger that a State is engaging in impermissible discrimination against the Federal Government is greatest when the State acts to benefit itself and those in privity with it. As we observed in *Phillips Chemical Co.*, "it does not seem too much to require that the State treat those who deal with the Government as well as it treats

those with whom it deals itself." *Id*., at 385.

We also take issue with the dissent's assertion that "it is peculiarly inappropriate to focus solely on the treatment of state governmental employees" because "[t]he State may always compensate in pay or salary for what it assesses in taxes." *Post*, at 824. In order to provide the same after-tax benefits to all retired state employees by means of increased salaries or benefit payments instead of a tax exemption, the State would have to increase its outlays by more than the cost of the current tax exemption, since the increased payments to retirees would result in higher federal income tax payments in some circumstances. This fact serves to illustrate the impact on the Federal Government of the State's discriminatory tax exemption for state retirees. Taxes enacted to reduce the State's employment costs at the expense of the federal treasury are the type of discriminatory legislation that the doctrine of intergovernmental tax immunity is intended to bar.

*Davis*, 489 U.S. at 815 n.4.

The District Court makes no attempt to meaningfully distinguish *Davis*, and instead cites *Davis* for a proposition inapposite to which it stands. *Cannon*, Op. at 15-16 n.5 (D.D.C. Jan. 6, 2014) (citing *Davis*, 489 U.S. at 817). J.A. 112-113. *Davis* makes no distinction whatsoever as to the mechanism of taxation, ***only the end result***. "[T]he Michigan Income Tax Act violates principles of intergovernmental tax immunity by favoring retired state and local government employees over retired federal employees." *Davis*, 489 U.S. at 817.

"Discrimination" is the "failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored." BLACK'S LAW DICTIONARY 534 (9th ed. 2009); accord, *id*., at 420 (5th ed. 1979); see also WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 648 (1976) ("discriminates" means "to

make a difference in treatment or favor on a class or categorical basis in disregard of individual merit"). To charge one group of taxpayers a 2% rate and another group a 4% rate, if the groups are the same in all relevant respects, is to discriminate against the latter.

*CSX Transp., Inc. v. Ala. Dep't of Revenue*, 131 S. Ct. 1101, 1108 (2011).

Whether a state's "tax fits within the Public Salary Tax Act's allowance is a question of federal law. The practical impact, not the State's name tag, determines the answer to that question." *Jefferson County v. Acker*, 527 U.S. 423, 439 (1999) (applying Buck Act definition of tax, 4 U.S.C. § 110, to § 111, citing *Detroit v. Murray Corp. of America*, 355 U.S. 489, 492 (1958) ("In determining whether the tax violates the Government's constitutional immunity we must look through form and behind labels to substance.")) "[I]rrespective of what the tax is called, if its purpose is to produce revenue, it is an income or a receipts tax under the Buck Act." *Humble Oil & Refining Co. v. Calvert*, 464 S.W.2d 170, 175-176 (Tex. Civ. App. 1971). Accord, *United States v. Lewisburg Area School Dist.*, 539 F.2d 301, 309 (3d Cir. 1976) (citing *Howard v. Commissioners of Sinking Fund*, 344 U.S. 624 (1953)); *Portsmouth v. Fred C. Gardner Co.*, 215 Va. 491, 494 (1975) ("It does not require that the tax be denominated an income tax or that it conform to the federal income tax. If the tax in question is based upon income and is measured by that income in money or money's worth, as a net income tax, gross income tax, or gross receipts tax, it is an

income tax", citing *Humble Oil & Refining Co. v. Calvert*, 478 S.W.2d 926,

930 (Tex. 1972)).

> Section 111 was enacted as part of the Public Salary Tax Act of 1939, the primary purpose of which was to impose federal income tax on the salaries of all state and local government employees. Prior to adoption of the Act, salaries of most government employees, both state and federal, generally were thought to be exempt from taxation by another sovereign under the doctrine of intergovernmental tax immunity. This doctrine had its genesis in *McCulloch v. Maryland*, 4 Wheat. 316 (1819), which held that the State of Maryland could not impose a discriminatory tax on the Bank of the United States. Chief Justice Marshall's opinion for the Court reasoned that the Bank was an instrumentality of the Federal Government used to carry into effect the Government's delegated powers, and taxation by the State would unconstitutionally interfere with the exercise of those powers. *Id*., at 425-437.

> For a time, *McCulloch* was read broadly to bar most taxation by one sovereign of the employees of another. See *Collector v. Day*, 11 Wall. 113, 124-128 (1871) (invalidating federal income tax on salary of state judge); *Dobbins v. Commissioners of Erie County*, 16 Pet. 435 (1842) (invalidating state tax on federal officer). This rule "was based on the rationale that any tax on income a party received under a contract with the government was a tax on the contract and thus a tax 'on' the government because it burdened the government's power to enter into the contract." *South Carolina v. Baker*, 485 U.S. 505, 518 (1988).

*Davis*, 489 U.S. at 810-811.

> As a threshold matter, the State argues that § 111 applies only to current employees of the Federal Government, not to retirees such as appellant. In our view, however, the plain language of the statute dictates the opposite conclusion. Section 111 by its terms applies to "the taxation of pay *or compensation for personal services as an officer or employee* of the United States." (Emphasis added). While retirement pay is not actually disbursed during the time an individual is working for the Government, the amount of benefits to be received

in retirement is based and computed upon the individual's salary and years of service. 5 U.S.C. § 8339(a). We have no difficulty concluding that civil service retirement benefits are deferred compensation for past years of service rendered to the Government. See*, e. g., Zucker v. United States*, 758 F.2d 637, 639 (CA Fed.), *cert. denied*, 474 U.S. 842 (1985); *Kizas v. Webster*, 227 U. S. App. D. C. 327, 339, 707 F. 2d 524, 536, (1983), *cert. denied*, 464 U.S. 1042 (1984); *Clark v. United States*, 691 F. 2d 837, 842 (CA7 1982). And because these benefits accrue to employees on account of their service to the Government, they fall squarely within the category of compensation for services rendered "as an officer or employee of the United States." Appellant's federal retirement benefits are deferred compensation earned "as" a federal employee, and so are subject to § 111.

*Id*. at 808 (footnote omitted).

Any other interpretation of the nondiscrimination clause would be implausible at best. It is difficult to imagine that Congress consented to discriminatory taxation of the pensions of retired federal civil servants while refusing to permit such taxation of current employees, and nothing in the statutory language or even in the legislative history suggests this result. While Congress could perhaps have used more precise language, the overall meaning of § 111 is unmistakable: it waives whatever immunity past and present federal employees would otherwise enjoy from state taxation of salaries, retirement benefits, and other forms of compensation paid on account of their employment with the Federal Government, except to the extent that such taxation discriminates on account of the source of the compensation.

*Id*. at 810.

The District of Columbia offset the Appellants' salaries at a 100%

ratio to their pensions funded and administered by the United States

Treasury. The offsets benefited the District of Columbia by returning the

funds to the general fund and detriment the United States Government by

impacting a federal benefit promised to the Appellants. Pensions not funded by United States Treasury are not offset. The offset, regardless of the mechanism, was discriminatory and therefore violated the Public Salary Tax Act.

**3.**     **This Court has never opined as to whether D.C. Code § 5-723(e) was applicable to these Appellants where they were entitled to pensions prior to 1979, or as to whether subsequent enactments superseded the offset provision.**

> Notwithstanding any other provision of law, the salary of any annuitant who first becomes entitled to an annuity under this subchapter, after November 17, 1979, and who is subsequently employed by the government of the District of Columbia shall be reduced by such amount as is necessary to provide that the sum of such annuitant's annuity under this subchapter and compensation for such employment is equal to the salary otherwise payable for the position held by such annuitant. The provisions of this subsection shall not apply to an annuitant employed by the District of Columbia government under the Retired Police Officer Redeployment Amendment Act of 1992 or the Detective Adviser Act of 2004. The provisions of this subsection shall not apply to an annuitant employed by the D.C. Public Schools under the Retired Police Officer Public Schools Security Personnel Deployment Amendment Act of 1994.

D.C. CODE § 5-723(e).

The "November 17, 1979" language of D.C. Code § 5-723(e) properly reflects the state of affairs at the time of the enactment of the District of Columbia Retirement Reform Act of 1979, but was apparently never

updated to reflect the change in events which subsequently transpired.[1]  As of the enactment of the District of Columbia Retirement Reform Act of 1979, <u>all</u> retirement entitlements were intended to be funded and administered by the District of Columbia, with only additional "Federal payments to these Funds to help finance, in part, the liabilities for retirement benefits incurred by the District of Columbia prior to [Home Rule]".  Pᴜʙ. L. 96-122, Sec. 101 (b)(5).  As described above, this was not to be the case and responsibility for all pre-1997[2] entitlements were eventually taken over by the federal government.  The District of Columbia today makes <u>no</u> payment and provides <u>no</u> administration of <u>any</u> of the Appellants' retirement entitlements accrued prior to the 1997 enactment.

---

[1] The language of the 1979 Retirement Reform Act which enacted this section of § 5-723 is particularly important in this regard.  It does not state "the salary of any annuitant who first becomes entitled to an annuity under this subchapter, after November 17, 1979…".  It states instead, "the salary of any annuitant who first becomes entitled to an annuity under this section *after the date of the enactment of the District of Columbia Retirement Reform Act*…", the moment at which the federal government first attempted to hand off subsequent retirement liabilities to the Home Rule District of Columbia government.  Pᴜʙ. L. 96-122, Sec. 214 (emphasis added).  Of course, it would later turn out that the District of Columbia would not be responsible for pre-1997 liabilities.

[2] For the sake of expediency, the Appellants' use of "pre-1997" or "post-1997" continues to respectively refer to "prior to June 30, 1997" and "June 30, 1997 and after", as applicable to the 1997 Act.

The District of Columbia Retirement Protection Act of 1997 expressly superseded the inconsistent language of the District of Columbia Retirement Reform Act of 1979 found in D.C. Code § 5-723(e).

> This subtitle supersedes any provision of the Reform Act inconsistent with this subtitle and the regulations thereunder.

PUB. L. 105-33, Sec. 11084 (a)(1).

The § 5-723(e) language is completely inconsistent with the 1997 Act as the § 5-723(e) language is predicated entirely upon the fact, at the time, that responsibility of funding and administering all District of Columbia annuitants was transferred to the District of Columbia in 1979, a situation which was reversed with the 1997 Act. Any entitlement the District of Columbia had to offset annuity payments the District itself was paying was lost upon the United States Treasury's assumption of such payments in their entirety.

Under D.C. Act 15-489, the District of Columbia government must "treat former District government employees who are federal annuitants the same as former federal government employees who are federal annuitants by eliminating the reduction in pay of a former District government employee who is a reemployed federal annuitant." 51 D.C. REG. 8779 (2004).

The Defendant offset federal pension payments to the Plaintiffs from their

salaries, even though the Plaintiffs are indisputably "former District

government employees who are federal annuitants".

> Notwithstanding section 8344(a) of title 5, United States Code, the
> amendment made by section 2 of the District Government
> Reemployed Annuitant Offset Elimination Amendment Act of 2004
> (D.C. Law 15–207) shall apply with respect to ***any individual***
> employed in an appointive or elective position with the District of
> Columbia government after December 7, 2004.

Pub. L. 110-161, Sec. 807 (emphasis added).

None of this history or the copious conflicting language has ever been

sufficiently discussed or discerned by either this Court or the District Court.

Yet, nearly every element originates from Congressional enactments and

directly implicates federal funds.  Neither the District Court nor this Court

have ever reached the merits of the Appellants' claim that § 5-723(e) was

nullified by subsequent enactments, or was never applicable to them in the

first place.

In affirming the dismissal of the Appellants' constitutional claims, this

Court made an unexplained conclusion that D.C. Code § 5-723(e) is in some

way applicable to the Appellants in the present day.  This assertion ignored

the entire legislative history of public safety pension funding in the District

of Columbia and a key point of contention by the Appellants, that the

District of Columbia offset a pension that the District of Columbia ***does not***

*pay*. In remanding the case to the District Court for further consideration of the Appellants' challenges to § 5-723(e), this Court left the majority of their theories of relief unaddressed. If any of these theories proves valid, this Court's premise for dismissing their constitutional claims is also necessarily nullified.

> [T]he Court lays down a principle which is generally correct, in terms much broader than the decision, and not only much broader than the reasoning with which that decision is supported, but in some instances contradictory to its principle... The effort now made is, to apply the conclusion to which the Court was conducted by that reasoning in the particular case, to one in which the words have their full operation when understood affirmatively, and in which the negative, or exclusive sense, is to be so used as to defeat some of the great objects of the article.

*Cohens v. Virginia*, 19 U.S. 264, 401 (1821).

> If the District Court dismisses the case based on an incorrect reading of [*Mertens v. Hewitt Associates*, 508 U.S. 248 (1993)], the Second Circuit can correct its error, and if the Second Circuit does not do so this Court can grant certiorari. The Court's discussion of the relief available under § 502 (a)(3) and *Mertens* is purely dicta, binding upon neither us nor the District Court. The District Court need not read any of it--and, indeed, if it takes our suggestions to heart, we may very well reverse.

*CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1884 (2011) (SCALIA, J, concurring).

20

**4.    The District of Columbia has taken private property for public use without due process or just compensation in violation of the Fifth Amendment.**

"When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner". *Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002) (citing *United States v. Pewee Coal Co.,* 341 U.S. 114, 115 (1951)).  "Similarly, takings of contracts have been found where the government takes away property already acquired under the operation of the contract, deprives fruits already reduced to possession by [] lawfully made contracts, or repudiates debts to save money." *Buse Timber & Sales, Inc. v. United States*, 45 Fed. Cl. 258, 263 (1999) (citing *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41 (1986); *Perry v. United States*, 294 U.S. 330, 350-351 (1935); *Lynch v. United States*, 292 U.S. 571, 576-577 (1934)).  "Where 'the rights respecting the "taken" [property] were not reduced to writing by the parties, both takings and breach claims have been permitted.' *Buse Timber*, 45 Fed. Cl. at 262. In other words, '[i]f the right at issue is not governed by the terms of the parties' contract, plaintiff may pursue a takings remedy to vindicate that right.' *Detroit Edison Co. v. United States*, 56 Fed. Cl. 299, 302 (2003)." *Barlow & Haun, Inc. v. United States*, 87 Fed. Cl. 428, 439 (2009).

> In the oft-repeated words of *Armstrong v. United States*, 364 U.S. 40, 49 (1960), the Fifth Amendment is designed "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."

*Castle v. United States*, 48 Fed. Cl. 187, 218 (2000) (parallel citations omitted).

### a. The District of Columbia took the Appellants' retirement benefits without lawful authority.

D.C. CODE § 5-723(e), albeit inartfully and certainly <u>incorrectly</u> given the subsequent legislative history, distinguishes PFRS annuity entitlements funded by the District of Columbia and those funded by the federal government.  Under the twisted legislative history of PFRS, annuitants with service prior to this date are today paid by the United States Department of the Treasury for entitlements accrued prior to this date, and paid by the District of Columbia for entitlements accrued after this date.  As the District of Columbia does not pay entitlements for service prior to June 30, 1997, it was not entitled to offset such entitlements against salaries it paid to PFRS annuitants.

The 1979 language of D.C. Code § 5-723(e) properly asserted (at the time) that the District of Columbia could offset post-November 17, 1979 annuity payments to District of Columbia retirees, payments the District of Columbia itself was supposed to be making.  The District improperly

employed § 5-723(e) *to take an offset against annuity payments it does not pay*.  The law does not permit this.

The District of Columbia Retirement Protection Act of 1997 expressly supersedes the inconsistent language of the District of Columbia Retirement Reform Act of 1979 found in D.C. Code § 5-723(e).  *See* PUB. L. 105-33, Sec. 11084(a)(1).  The § 5-723(e) language is completely inconsistent with the 1997 Act as the § 5-723(e) language is predicated upon the fact, at the time, that responsibility of funding and administering all District of Columbia annuitants was transferred to the District of Columbia in 1979, a situation which was reversed with the 1997 Act.  Any entitlement the District of Columbia had to offset annuity payments the District itself was paying was lost upon the United States Treasury's assumption of such payments in their entirety.

On August 2, 2004, the District of Columbia City Council enacted D.C. Act 15-489, eliminating the reduction in pay of a District of Columbia government retiree identified in 5 U.S.C. § 8331 and is subsequently rehired by the District of Columbia after December 7, 2004.  D.C. CODE § 1-611.03(b).  The stated purpose of D.C. Act 15-489 was "to treat former District government employees who are federal annuitants the same as former federal government employees who are federal annuitants by

eliminating the reduction in pay of a former District government employee who is a reemployed federal annuitant." 51 D.C. Reg. 8779. None of the language in D.C. Act 15-489 indicates that a PFRS federal annuitant would not be entitled to this protection. This law remains in effect today.

### b. The District of Columbia took the retirement benefits without any kind of meaningful pre-deprivation due process.

By taking pay accrued to them in consideration of services rendered to the District of Columbia without lawful authority, the District of Columbia deprived property rights vested upon the Appellants by law, including a reliance interest in continuing undiminished benefits of their respective employment. Such property interests were taken absent any due process or compensation, in violation of the Fifth and Fourteenth Amendments[3] of the U.S. Constitution.

> The Fourteenth Amendment places procedural constraints on the actions of government that work a deprivation of interests enjoying the stature of "property" within the meaning of the Due Process Clause. Although the underlying substantive interest is created by "an independent source such as state law," federal constitutional law determines whether that interest rises to the level of a "legitimate claim of entitlement" protected by the Due Process Clause.

_____

[3] The District of Columbia is subject to the Fourteenth Amendment by, *inter alia*, reverse incorporation doctrine. *Bolling v. Sharpe,* 347 U.S. 497, 498-499 (1954).

*Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978) (quoting

*Board of Regents v. Roth*, 408 U.S. 564, 577 (1972); *Perry v. Sindermann*,

408 U.S. 593, 602 (1972)).

> Property interests… are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Roth*, 408 U.S. at 577.

That the Appellants have an entitlement by law to their ordinary pay

for *work already performed* is axiomatic.  Further, regardless of whether

they were at-will employees or not, if they continue such employment, they

were entitled to the undiminished benefits they were already promised.  "A

deprivation of constitutional dimensions occurs when the state stops the flow

of benefits associated with a protected interest for any appreciable length of

time."  *D'Acquisto v. Washington*, 640 F. Supp. 594, 609 (N.D. Ill. 1986)

(citing *Memphis Light*, 436 U.S. at 20; *Goss v. Lopez*, 419 U.S. 565, 576

(1975)).

> Procedural due process imposes constraints on governmental decisions which deprive individuals of "liberty" or "property" interests . . . . [The Supreme Court] consistently has held that some form of hearing is required before an individual is finally deprived of a property interest. . . . The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner."

*Edwards v. Shinseki*, 582 F.3d 1351, 1355 (Fed. Cir. 2009) (quoting

*Mathews v. Eldridge*, 424 U.S. 319, 332-33 (1976) (quoting *Armstrong v.*

*Manzo*, 380 U.S. 545, 552 (1965)) (internal citations omitted)).

      The District of Columbia has never provided any meaningful means

for the Appellants to respond to its claim upon the Appellants' salaries in the

guise of a § 5-723(e) offset and the Appellants were given no pre-

deprivation forum to assert their defenses against it.  The District of

Columbia can not possibly suggest that, given its prior contemplation of the

offset since October 12, 2011, *id.*, that there was any need for quick action

or that such a pre-deprivation hearing was impracticable.  *Reynolds v.*

*Wagner*, 936 F. Supp. 1216, 1228 (E.D. Pa. 1996) (quoting *Parratt v.*

*Taylor*, 451 U.S. 527, 539 (1981)) *aff'd*, 128 F.3d 166 (3d Cir. 1997).  Given

that the District of Columbia had never imposed this offset previously, and

the sole law that the District of Columbia relies upon was expressly

superseded in 1997, there was no "established governmental policy" which

obviated the need for a hearing.  *Id.*

> The timing and nature of the required hearing "will depend on
> appropriate accommodation of the competing interests involved."
> [*Goss, supra.*]. These include the importance of the private
> interest and the length or finality of the deprivation, *see* [*Memphis
> Light*, *supra*], and *Mathews v. Eldridge*, 424 U.S., at 334-335; the
> likelihood of governmental error, *see id.*, at 335; and the magnitude of
> the governmental interests involved, *see ibid.*, and [*Wolff v.*
> *McDonnell*, 418 U.S. 539 (1974)].

*Logan v. Zimmerman Brush Co*., 455 U.S. 422, 434 (1982) (footnote omitted).[4]

### c.  The Appellants had no administrative remedy.

The District of Columbia claimed, and the District Court agreed, that there was a requirement that the Appellants exhaust administrative remedies under the District of Columbia Comprehensive Merit Protection Act.  J.A. 82-83. The faults with this argument are manifest.  First of all, no remedy was suggested or offered by the District of Columbia at the time of the deprivation.

If some or all of the relief sought by the Appellants was beyond the authority of the purported administrative remedy, or if the District Court had exclusive jurisdiction over such relief, District of Columbia law prohibited "splitting" the claims between the judicial and the administrative processes and the Appellants were compelled to pursue all of their remedies with the District Court.

> There is case law in this jurisdiction, drawn from public employment litigation, that reinforces the foregoing analysis. In *King v. Kidd* [640 A.2d 656 (D.C. 1993)], we held that a public employee's common law tort claim for intentional infliction of emotional distress, which she

---

[4] There certainly were no post-deprivation proceedings offered by the District of Columbia.  It appears that those Appellants who did attempt to contact the Deputy General Counsel in the manner suggested by the letters did not receive responses to their inquiries.

had joined with a statutory claim for sexual harassment, could go forward in Superior Court against the hierarchy of supervisors who allegedly had harassed her, without preemption by an administrative remedy under CMPA. Specifically, we held that CMPA's personnel provisions did not preempt plaintiffs "tort claims of intentional infliction of emotional distress based on acts of sexual harassment and subsequent retaliation." *Id*., 640 A.2d at 664. We sustained the court's "jurisdiction to hear both [plaintiff's] sexual harassment claim and her interrelated or 'pendent' tort claim," *id*. (citation and footnote omitted), because plaintiff's tort claim was "fundamentally linked to her sexual harassment claim," *i.e.*, it "had an inherent 'nexus' to" that claim. *Id*.

*Estate of Underwood v. National Credit Union Admin.*, 665 A.2d 621, 636

(D.C. 1995).

After reviewing the purposes and text of the CMPA, we find no basis to conclude that CMPA's remedial system preempts Kidd's tort claim of intentional infliction of emotional distress based on acts of sexual harassment and subsequent retaliation.

*King*, 640 A.2d at 664 (citation omitted).

Herein, the Appellants pled, and prevailed upon, violations of the Fair

Labor Standards Act. They sought emergency and permanent injunctive

relief from the District Court. See ECF Docket # 2, 3, 12 and J.A. 9, 13-14.

Where the District Court had indisputable federal question jurisdiction over

the Appellants' FLSA claims, their Public Salary Tax Act claim and their

constitutional torts, the District Court had exclusive jurisdiction over the

Appellants' federal retirement benefit claims under D.C. Code § 1-803.01,

and the CMPA could not provide the injunctive remedies requested, there

could be no requirement of exhaustion of administrative remedies made

upon them.

> Requiring an inmate to exhaust an administrative grievance process
> that cannot address the subject of his or her complaint would serve
> none of the purposes of exhaustion of administrative remedies. When
> the BOP cannot take any action at all in response to a complaint, it has
> nothing to offer that could possibly satisfy the prisoner and obviate
> the need for litigation. See [*Porter v. Nussle*, 534 U.S. 516, 525
> (2002)]. Requiring exhaustion when no relief is available "is more
> likely to inflame than to mollify passions, and thus is unlikely to
> 'filter out some frivolous claims.'" *Brown v. Valoff*, 422 F.3d 926,
> 936 (9th Cir. 2005) (quoting *Porter*, 534 U.S. at 525) (first quotation
> omitted). And prison administrators are unlikely to spend resources
> developing an administrative record when that process cannot
> possibly lead to relief, nor would there be much record to develop
> when the prisoner is challenging, as here, the enforceability of a
> statute rather than the prison's method of enforcement. *See Porter*,
> 534 U.S. at 525; *Brown*, 422 F.3d at 936. Finally, requiring
> exhaustion in these circumstances is not necessary for protection of
> administrative agency authority from judicial interference, because no
> administrative program or mistake is at issue, nor can an
> administrative solution resolve the complaint. See *Woodford v. Ngo*,
> 548 U.S. 81, 89 (2006).

*Kaemmerling v. Lappin*, 553 F.3d 669, 676 (D.C. Cir. 2008) (footnote,

parallel citations omitted).

> Granting DOES primary jurisdiction over appellant's emotional
> distress claim also would have a chilling impact on enforcement of the
> Human Rights Act policy prohibiting sexual harassment. Involvement
> of DOES not only would create claim-splitting problems but also
> would delegate jurisdiction to an administrative agency not used to
> dealing with sexual harassment issues, and would apply a statute that
> severely caps financial recovery in an area where the legislature has
> indicated a strong preference for compensatory and punitive damages.

*Estate of Underwood*, 665 A.2d at 630.

Applying the federal definition of a "cause of action" and the rule against splitting a single cause of action to this case, plaintiff's prior civil rights action and the instant negligence action arise out of the same core of operative facts, . . . Since the two lawsuits involve this single core of operative facts, they constitute identical causes of action for *res judicata* purposes. Although this single group of facts may conceivably give rise to both federal claims for relief and negligence claims, under the federal definition, a single cause of action remains . . . Thus, the federal *res judicata* doctrine precludes plaintiff from litigating any matters that he could have raised in the previous lawsuit, including negligence, which were within the federal *court's* pendent jurisdiction.

*Gilles v. Ware*, 615 A.2d 533, 553 n.11 (D.C. 1992) WAGNER, J., *concurring*.

The District Court's prior assertion that the Appellants, first employed by the District of Columbia prior to Home Rule, were subject to CMPA at all was incorrect.

Plaintiffs' only response is that the CMPA does not apply to them, but that argument is factually and legally flawed. The single authority on which they rely—D.C. CODE § 1-207.13(d) (*see* Pls.' Reply at 10)—is inapposite, since that provision does not relate to the CMPA and, in any case, applies to individuals employed by the federal government before the District established its own personnel system in 1979. D.C. Code § 1-207.13(d); *see Dist. of Columbia v. Hunt*, 520 A.2d 300, 302 (D.C. 1987). It is therefore irrelevant to the plaintiffs, all of whom were hired by the District after 2004, and, as a result, their complaints are covered by the CMPA grievance process. See [*Lattisaw v. District of Columbia*, 905 A.2d 790, 793 (D.C. 2006)] ("[F]or the purpose of determining the CMPA's applicability, our case law has emphasized that 'grievances' are to be broadly construed.")

30

J.A. 83.[5]

> No officer or employee shall, by reason of his transfer to the District government under this chapter or his separation from service under this chapter, be deprived of any civil service rights, benefits, and privileges held by him prior to such transfer or any right of appeal or review he may have by reason of his separation from service.

D.C. CODE § 1-207.13(d).

The District Court herein simply claimed that the Appellants were "hired by the District after 2004", ignoring that each and all of them were instead first employed by the District of Columbia prior to October 1, 1987, J.A. 16, and that their claims herein relate directly to their retirement benefits from that employment. In addition to the exclusive jurisdiction of the District Court for:

> (1) Civil actions brought by participants or beneficiaries pursuant to this chapter, and

> (2) Any other action otherwise arising (in whole or part) under this chapter or the contract.

D.C. CODE § 1-815.02, the Appellants were entitled to judicial review of such claims absent the CMPA grievance procedures, as their employment with the District of Columbia predates the CMPA and D.C. Code expressly

---

[5] This was not the "Plaintiffs' only response" to the District of Columbia's failure to exhaust administrative remedies claim. *See* ECF Docket # 30 at 43-47 and ECF Docket # 35 at 10-11. The District Court simply ignored the remainder of these arguments.

provides that the Appellants are entitled to such rights of review as they had

prior to Home Rule.

Contrary to the District Court's citation, the applicability of the

CMPA to the Appellants cannot be construed so "broadly" as to defeat the

evident grandfather provisions afforded pre-Home Rule employees.

> Although subject to congressional review, the Council's powers of
> ordinary legislation are broad; they are limited only by specified
> exceptions and by the general requirement that legislation be
> consistent with the U.S. Constitution and the Home Rule Act.  See
> *Bishop v. District of Columbia*, D.C.App., 411 A.2d 997, 999 (*en
> banc*), *cert. denied*, 446 U.S. 966 (1980).  In this sense, the District
> resembles a full "home rule" city with general powers to govern local
> affairs except for express limitations, in contrast with a limited "home
> rule" city or a municipal corporation to which a state has granted only
> enumerated powers.  As a general rule, courts strictly construe the
> powers of municipal corporations, whereas they liberally read the
> authority of full "home rule" cities.  In construing the delegation of
> legislative power to the Council, however, this court must pay
> substantial attention to the unique nature of the District's policy,
> always interpreting the Home Rule Act "with a central focus: the
> intent of Congress." [*District of Columbia v. Washington Home
> Ownership Council, Inc.*, 415 A.2d 1349, 1351 (D.C. 1980)] (footnote
> omitted).

*Convention Center Referendum Committee v. District of Columbia Bd. of*

*Elections & Ethics*, 441 A.2d 889, 903-904 (D.C. 1981) (citations, footnote

omitted).

The Appellants sufficiently pled that they were lawfully entitled to

their salaries without offset and that the District of Columbia took such

salaries without lawful cause, without compensation and without any

mechanism for the Appellants to address the District of Columbia's claims

prior to the taking.  The Appellants were not required to exhaust any

administrative remedies prior to seeking injunctive relief on their federal

claims.  The District of Columbia was not entitled to any summary

adjudication on these points.  This Court has not previously explained

otherwise.


**5.      There is indisputable Federal Question jurisdiction herein.**

The District of Columbia Self-Government and Governmental

Reorganization Act, Pub. L. 93-198, 87 Stat. 774 (1973) (codified as

amended at D.C. Code § 1-201.01 *et seq.*), prohibits the District of

Columbia government from imposing "any tax on the whole or any portion

of the personal income, either directly or at the source thereof, of any

individual not a resident of the District".  D.C. CODE § 1-206.02.  The

United States Code defines an income tax as "any tax levied on, with respect

to, or measured by, net income, gross income, or gross receipts."  4 U.S.C. §

110 (c).

The offset imposed against the Appellants is imposed at a direct 100%

ratio against their pension payments, that the money is returned to the

District's general fund and it is not used for some narrow specific purpose.

"It is a question of federal law whether a municipal charge constitutes a tax." *Qwest Commns. Corp. v. City of Berkeley*, 146 F. Supp. 2d 1081, 1091 (N.D. Cal. 2001) (citing *Wright v. Riveland*, 219 F.3d 905, 911 (9th Cir. 2000); *Trailer Marine Transport Corp. v. Rivera Vazquez*, 977 F.2d 1 (1st Cir. 1992)).  Herein, "immunity from state taxation is asserted on the basis of federal law with respect to persons or entities in which the United States has a real and significant interest."  *Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 471 (1976) (quoting *Confederated Salish & Kootenai Tribes etc. v. Moe*, 392 F. Supp. 1297, 1303 (D. Mont. 1974)).

The Appellants challenge an unnamed tax imposed upon them in violation of D.C. Code § 1-206.02 (a)(5).  See *Banner v. United States*, 428 F.3d 303, 305 (D.C. Cir. 2005) ("[t]he local government of the District of Columbia is prohibited by Congress from imposing a 'commuter tax' -- from taxing the personal income of those who work in the District but reside elsewhere").  The concept that the interplay between the Federal Government and the home rule District of Columbia is not a federal question is simply unsupportable.  "The Constitution gives Congress exclusive legislative authority in all matters pertaining to the District of Columbia." *Id*. (citing U.S. CONST. art. I, § 8, cl. 17).  "Congress has delegated to the

34

District the authority to tax the personal income of District residents; it has

withheld such authority to tax non-residents who work in the District." *Id*.

at 306-307.

> The Home Rule Act is thus a hybrid statute. Its impact extends
> beyond the narrow sphere of the District of Columbia to various
> federal employees and to the actual structure of the Department of
> Labor. In *Key v. Doyle*, 434 U.S. 59 (1977), the Supreme Court
> equated exclusively local provisions of the D.C. Code to laws
> "enacted by state and local governments having plenary power to
> legislate for the general welfare of their citizens." Section 204 of the
> Home Rule Act is not such a provision. A state or local statute cannot
> direct the federal government to affect transfers or to abolish positions
> altering its structure in the manner required by section 204.

*Thomas v. Barry*, 729 F.2d 1469, 1471 (D.C. Cir. 1984) (parallel citations,

footnote omitted).

The District of Columbia Retirement Protection Act of 1997 provides

that the "United States District Court for the District of Columbia shall have

exclusive jurisdiction and venue, regardless of the amount in controversy…

(1) Civil actions brought by participants or beneficiaries [to federal benefit

payments under District of Columbia retirement programs], and (2) Any

other action otherwise arising (in whole or part) under this chapter or the

contract. D.C. Code § 1-815.02(a). Even setting aside this express

provision of federal venue within D.C. Code § 1-815.02(a), the very nature

of the federal legislation and the federal funds implicated mandate Federal

Question Jurisdiction herein.

35

The factual allegations herein are inextricably intertwined with the Appellants' federal claims. "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy…" 28 U.S.C. § 1367(a) (emphasis added). "[I]t is clear that section 1367(a) authorizes a district court to exercise its supplemental jurisdiction in mandatory language." *Lindsay v. Gov't Employees. Ins. Co.*, 448 F.3d 416, 421 (D.C. Cir. 2006) (citing *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1509 (3d Cir. 1996) ("By its language § 1367(a) confers jurisdiction in mandatory terms to include those cases 'which form part of the same case or controversy under Article III of the United States Constitution" (except as expressly excluded by statute or as provided for in subsections (b) and (c)); *McCoy v. Webster*, 47 F.3d 404, 406 n.3 (11th Cir. 1995) ("Section 1367(a) *requires* the district court to exercise supplemental jurisdiction over claims which are closely related to claims over which the district court has original jurisdiction." (emphasis added)); *Executive Software N. Am. v. U.S. Dist. Ct. for the Cent. Dist. of Cal.*, 24 F.3d 1545, 1555 (9th Cir. 1994) ("By use of the word 'shall,' the statute makes clear that if power is conferred under section 1367(a), and

its exercise is not prohibited by section 1367(b), a court can decline to assert

supplemental jurisdiction over a pendent claim only if one of the four

categories specifically enumerated in section 1367(c) applies.")).

"A federal claim and a state law claim form part of the same Article

III case or controversy if the two claims derive from a common nucleus of

operative fact such that the relationship between [the federal] claim and the

state claim permits the conclusion that the entire action before the court

comprises but one constitutional case." *Lindsay*, 448 F.3d at 423-424

(quoting *Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164-165 (1997)

(quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966))

(additional quotation marks omitted, alteration in original))). "Nonfederal

claims are part of the same 'case' as federal claims when they… are such

that a plaintiff would ordinarily be expected to try them in one judicial

proceeding." *Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850, 855-856 (9th Cir.

2004) (quoting *Trs. of the Constr. Indus. & Laborers Health & Welfare v.

Desert Valley Landscape & Maint., Inc.*, 333 F.3d 923, 925 (9th Cir. 2003)

(internal quotation marks omitted)).  See also *Osborn v. Haley*, 549 U.S.

225, 245 (2007) (quoting *Mine Workers*, *supra*).

The District of Columbia failed to *even plead* any of the four

categories enumerated in section 1367(c) and instead relied solely upon the

unsupportable proposition that once the Appellants' FLSA claim was fully

adjudicated, and now their Public Salary Tax Act claims as well, the District

Court could simply eschew supplemental jurisdiction.   The District of

Columbia offered no additional argument and simply adopted the District

Court's unfounded position.

> It is indeed unfortunate if the judicial manpower provided by Congress in any district is insufficient to try with reasonable promptness the cases properly filed in or removed to that court in accordance with the applicable statutes.  But an otherwise properly removed action may no more be remanded because the district court considers itself too busy to try it than an action properly filed in the federal court in the first instance may be dismissed or referred to state courts for such reason.

*Thermtron Prods. v. Hermansdorfer*, 423 U.S. 336, 344-345 (1976) (citing

*McClellan v. Carland*, 217 U.S. 268 (1910); *Chicot County v. Sherwood*,

148 U.S. 529 (1893); *Hyde v. Stone*, 61 U.S. 170 (1858)).

> Considering *Thermtron* together with [*Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343 (1988)] and [*Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996)], we conclude the district court lacked the power to remand this case. The district court relied neither on a ground specified in § 1447 nor on any ground upon which it might instead have dismissed the case.  Rather, the district court remanded the case simply because Barksdale's counsel said Superior Court would be a more congenial forum for him, much as the district court in *Thermtron* had remanded that case merely "because the district court consider[ed] itself too busy to try it." 423 U.S. at 344.  Hence, we hold the district court erred in remanding Barksdale's case to Superior Court.

*Barksdale v. Wash. Metro. Area Transit Auth.*, 512 F.3d 712, 716 (D.C. Cir. 2008).

"[T]he discretion to decline supplemental jurisdiction is available only if founded upon an enumerated category of [28 U.S.C. § 1367(c)].'" *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 702 F.3d 685, 701 (2d Cir. 2012) (quoting *Treglia v. Town of Manlius*, 313 F.3d 713, 723 (2d Cir. 2002) (quoting *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 448 (2d Cir. 1998) (alteration in *Treglia*))).  That the Appellants have prevailed upon one of their federal claims forming part of the same case and controversy herein is not an enumerated cause to dismiss what are questionably state claims under § 1367(c).  Therefore, it could not form the basis for dismissal as demanded by the District of Columbia.

Equally so here, if § 5-723(e) is now found to violate the Public Salary Tax Act, the prior dismissal of the Appellants' constitutional claims are again invalidated.  Any "novel issue" regarding the Appellants' offsets is profoundly interrelated to the history of Home Rule.  If these issues are not entirely federal, they are indisputably "hybrid" under *Thomas*, *supra*, thus invoking the District Court's subject matter jurisdiction.

## VIII. Conclusion

The District Court's January 6, 2014 Opinion and Order should be reversed with instructions for the District Court to enter summary judgment for Appellants' illegal taxation and takings claims. The prior finding of such federal subject matter jurisdiction for the FLSA claims should require reversal of the District Court's dismissal of the Appellants' other claims.

Respectfully submitted, this 27th day of August, 2014,

_____
Matthew August LeFande
Attorney at Law PLLC
DC Bar #475995
4585 North 25th Road
Arlington VA 22207
Tel: (202) 657-5800
Fax: (202) 318-8019
email: matt@lefande.com
Attorney for Appellants

**4 U.S.C. § 110.  Same; definitions**

As used in sections 105-109 of this title [4 USCS §§ 105-109]--
…
(c) The term "income tax" means any tax levied on, with respect to, or measured by, net income, gross income, or gross receipts.
…


**4 U.S.C. § 111.  Same; taxation affecting Federal employees; income tax**

(a) General rule. The United States consents to the taxation of pay or compensation for personal service as an officer or employee of the United States, a territory or possession or political subdivision thereof, the government of the District of Columbia, or an agency or instrumentality of one or more of the foregoing, by a duly constituted taxing authority having jurisdiction, if the taxation does not discriminate against the officer or employee because of the source of the pay or compensation.
…


**5 U.S.C. § 8331.  Definitions**

For the purpose of this subchapter [5 USCS §§ 8331 et seq.]--
  (1) "employee" means--
…
    (G) an individual first employed by the government of the District of Columbia before October 1, 1987;
…
    (L) an employee described in section 2105(c) [5 USCS § 2105(c)] who has made an election under section 8347(q)(1) [5 USCS § 8347(q)(1)] to remain covered under this subchapter [5 USCS §§ 8331 et seq.];
  but does not include--
…
    (ii) an employee subject to another retirement system for Government employees (besides any employee excluded by clause (x), but including any employee who has made an election under section 8347(q)(2) [5 USCS § 8347(q)(2)] to remain covered by a retirement system established for employees described in section 2105(c) [5 USCS § 2105(c)]);
…
    (iv) an individual or group of individuals employed by the government of the District of Columbia excluded by the Office under section 8347(h) of this title [5 USCS § 8347(h)];
...
  (7) "Government" means the Government of the United States, the government of the District of Columbia, Gallaudet University, and, in the case of an employee described in paragraph (1)(L), a nonappropriated fund instrumentality of the Department of Defense

or the Coast Guard described in section 2105(c) [5 USCS § 2105(c)];

## 5 U.S.C. § 8339.  Computation of annuity

(a) Except as otherwise provided by this section, the annuity of an employee retiring under this subchapter [5 USCS §§ 8331 et seq.] is--

   (1) 1 1/2 percent of his average pay multiplied by so much of his total service as does not exceed 5 years; plus

   (2) 1 3/4 percent of his average pay multiplied by so much of his total service as exceeds 5 years but does not exceed 10 years; plus

   (3) 2 percent of his average pay multiplied by so much of his total service as exceeds 10 years.

However, when it results in a larger annuity, 1 percent of his average pay plus $ 25 is substituted for the percentage specified by paragraph (1), (2), or (3) of this subsection, or any combination thereof.

…

## 5 U.S.C. § 8344.  Annuities and pay on reemployment

(a) If an annuitant receiving annuity from the Fund, except--

   (1) a disability annuitant whose annuity is terminated because of his recovery or restoration of earning capacity;

   (2) an annuitant whose annuity, based on an involuntary separation (other than an automatic separation or an involuntary separation for cause on charges of misconduct or delinquency), is terminated under subsection (b) of this section;

   (3) an annuitant whose annuity is terminated under subsection (c) of this section; or

   (4) a Member receiving annuity from the Fund;

becomes employed in an appointive or elective position, his service on and after the date he is so employed is covered by this subchapter [5 USCS §§ 8331 et seq.]. Deductions for the Fund may not be withheld from his pay unless the individual elects to have such deductions withheld under subparagraph (A). An amount equal to the annuity allocable to the period of actual employment shall be deducted from his pay, except for lump-sum leave payment purposes under section 5551 of this title [5 USCS § 5551]. The amounts so deducted shall be deposited in the Treasury of the United States to the credit of the Fund. If the annuitant serves on a full-time basis, except as President, for at least 1 year, or on a part-time basis for periods equivalent to at least 1 year of full-time service, in employment not excluding him from coverage under section 8331(1)(i) or (ii) of this title [5 USCS § 8331(1)(i) or (ii)]--

   (A) deductions for the Fund may be withheld from his pay (if the employee so elects), and his annuity on termination of employment is increased by an annuity computed under section 8339(a), (b), (d), (e), (h), (i), (n), (q), (r), and (s) [5 USCS § 8339(a), (b), (d), (e), (h), (i), (n), (q), (r), and (s)] as may apply based on the period of employment and the

42

basic pay, before deduction, averaged during that employment; and
   (B) his lump-sum credit may not be reduced by annuity paid during that employment.

If the annuitant is receiving a reduced annuity as provided in section 8339(j) [5 USCS § 8339(j)] or section 8339(k)(2) of this title [5 USCS § 8339(k)(2)], the increase in annuity payable under subparagraph (A) of this subsection is reduced by 10 percent and the survivor annuity payable under section 8341(b) of this title [5 USCS § 8341(b)] is increased by 55 percent of the increase in annuity payable under such subparagraph (A), unless, at the time of claiming the increase payable under such subparagraph (A), the annuitant notifies the Office of Personnel Management in writing that he does not desire the survivor annuity to be increased. If the annuitant dies while still reemployed, the survivor annuity payable is increased as though the reemployment had otherwise terminated. If the described employment of the annuitant continues for at least 5 years, or the equivalent of 5 years in the case of part-time employment, he may elect, instead of the benefit provided by subparagraph (A) of this subsection, to deposit in the Fund an amount computed under section 8334(c) of this title [5 USCS § 8334(c)] covering that employment and have his rights redetermined under this subchapter [5 USCS §§ 8331 et seq.]. If the annuitant dies while still reemployed and the described employment had continued for at least 5 years, or the equivalent of 5 years in the case of part-time employment, the person entitled to survivor annuity under section 8341(b) of this title [5 USCS § 8341(b)] may elect to deposit in the Fund (to the extent deposits or deductions have not otherwise been made) and have his rights redetermined under this subchapter [5 USCS §§ 8331 et seq.].
…


## 28 U.S.C. § 1291. Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title [28 USCS §§ 1292(c) and (d) and 1295].


## 28 U.S.C. § 1367. Supplemental jurisdiction

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

(b) In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title [28 USCS § 1332], the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332 [28 USCS § 1332].

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--
   (1) the claim raises a novel or complex issue of State law,
   (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
   (3) the district court has dismissed all claims over which it has original jurisdiction, or
   (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

(d) The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

(e) As used in this section, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.


## 28 U.S.C. § 1447.  Procedure after removal generally

(a) In any case removed from a State court, the district court may issue all necessary orders and process to bring before it all proper parties whether served by process issued by the State court or otherwise.

(b) It may require the removing party to file with its clerk copies of all records and proceedings in such State court or may cause the same to be brought before it by writ of certiorari issued to such State court.

(c) A motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a) [28 USCS § 1446(a)]. If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded. An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal. A certified copy of the order of remand shall be mailed by the clerk to the clerk of the State court. The State

court may thereupon proceed with such case.

(d) An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise, except that an order remanding a case to the State court from which it was removed pursuant to section 1442 or 1443 of this title [28 USCS § 1442 or 1443] shall be reviewable by appeal or otherwise.

(e) If after removal the plaintiff seeks to join additional defendants whose joinder would destroy subject matter jurisdiction, the court may deny joinder, or permit joinder and remand the action to the State court.

### D.C. Code § 1-201.01. Short title

This chapter may be cited as the "District of Columbia Home Rule Act".

### D.C. Code § 1-201.02. Purposes [Formerly § 1-201]

(a) Subject to the retention by Congress of the ultimate legislative authority over the nation's capital granted by article I, § 8, of the Constitution, the intent of Congress is to delegate certain legislative powers to the government of the District of Columbia; authorize the election of certain local officials by the registered qualified electors in the District of Columbia; grant to the inhabitants of the District of Columbia powers of local self-government; modernize, reorganize, and otherwise improve the governmental structure of the District of Columbia; and, to the greatest extent possible, consistent with the constitutional mandate, relieve Congress of the burden of legislating upon essentially local District matters.

(b) Congress further intends to implement certain recommendations of the Commission on the Organization of the Government of the District of Columbia and take certain other actions irrespective of whether the charter for greater self-government provided for in subchapter IV of this chapter is accepted or rejected by the registered qualified electors of the District of Columbia.

### D.C. Code § 1-206.02. Limitations on the Council [Formerly § 1-233]

(a) The Council shall have no authority to pass any act contrary to the provisions of this chapter except as specifically provided in this chapter, or to:

(1) Impose any tax on property of the United States or any of the several states;

(2) Lend the public credit for support of any private undertaking;

(3) Enact any act, or enact any act to amend or repeal any Act of Congress, which

concerns the functions or property of the United States or which is not restricted in its application exclusively in or to the District;

(4) Enact any act, resolution, or rule with respect to any provision of Title 11 (relating to organization and jurisdiction of the District of Columbia courts);

(5) Impose any tax on the whole or any portion of the personal income, either directly or at the source thereof, of any individual not a resident of the District (the terms "individual" and "resident" to be understood for the purposes of this paragraph as they are defined in § 47-1801.04);

(6) Enact any act, resolution, or rule which permits the building of any structure within the District of Columbia in excess of the height limitations contained in § 6-601.05, and in effect on December 24, 1973;

(7) Enact any act, resolution, or regulation with respect to the Commission on Mental Health;

(8) Enact any act or regulation relating to the United States District Court for the District of Columbia or any other court of the United States in the District other than the District courts, or relating to the duties or powers of the United States Attorney or the United States Marshal for the District of Columbia;

(9) Enact any act, resolution, or rule with respect to any provision of Title 23 (relating to criminal procedure), or with respect to any provision of any law codified in Title 22 or Title 24 (relating to crimes and treatment of prisoners), or with respect to any criminal offense pertaining to articles subject to regulation under Chapter 45 of Title 22 during the 48 full calendar months immediately following the day on which the members of the Council first elected pursuant to this chapter take office; or

(10) Enact any act, resolution, or rule with respect to the District of Columbia Financial Responsibility and Management Assistance Authority established under § 47-391.01(a).

(b) Nothing in this chapter shall be construed as vesting in the District government any greater authority over the National Zoological Park, the National Guard of the District of Columbia, the Washington Aqueduct, the National Capital Planning Commission, or, except as otherwise specifically provided in this chapter, over any federal agency, than was vested in the Commissioner prior to January 2, 1975.

(c) (1) Except acts of the Council which are submitted to the President in accordance with Chapter 11 of Title 31, United States Code, any act which the Council determines, according to § 1-204.12(a), should take effect immediately because of emergency circumstances, and acts proposing amendments to subchapter IV of this chapter and except as provided in § 1-204.62(c) and § 1-204.72(d)(1) the Chairman of the Council shall transmit to the Speaker of the House of Representatives, and the President of the Senate, a copy of each act passed by the Council and signed by the Mayor, or vetoed by

46

the Mayor and repassed by two-thirds of the Council present and voting, each act passed by the Council and allowed to become effective by the Mayor without his signature, and each initiated act and act subject to referendum which has been ratified by a majority of the registered qualified electors voting on the initiative or referendum. Except as provided in paragraph (2) of this subsection, such act shall take effect upon the expiration of the 30-calendar-day period (excluding Saturdays, Sundays, and holidays, and any day on which neither House is in session because of an adjournment sine die, a recess of more than 3 days, or an adjournment of more than 3 days) beginning on the day such act is transmitted by the Chairman to the Speaker of the House of Representatives and the President of the Senate, or upon the date prescribed by such act, whichever is later, unless during such 30-day period, there has been enacted into law a joint resolution disapproving such act. In any case in which any such joint resolution disapproving such an act has, within such 30-day period, passed both Houses of Congress and has been transmitted to the President, such resolution, upon becoming law, subsequent to the expiration of such 30-day period, shall be deemed to have repealed such act, as of the date such resolution becomes law. The provisions of § 1-206.04, except subsections (d), (e), and (f) of such section, shall apply with respect to any joint resolution disapproving any act pursuant to this paragraph.

   (2) In the case of any such act transmitted by the Chairman with respect to any act codified in Title 22, Title 23, or Title 24 of the District of Columbia Code, such act shall take effect at the end of the 60-day period beginning on the day such act is transmitted by the Chairman to the Speaker of the House of Representatives and the President of the Senate unless, during such 60-day period, there has been enacted into law a joint resolution disapproving such act. In any case in which any such joint resolution disapproving such an act has, within such 60-day period, passed both Houses of Congress and has been transmitted to the President, such resolution, upon becoming law subsequent to the expiration of such 60-day period shall be deemed to have repealed such act, as of the date such resolution becomes law. The provisions of § 1-206.04, relating to an expedited procedure for consideration of joint resolutions, shall apply to a joint resolution disapproving such act as specified in this paragraph.

   (3) The Council shall submit with each act transmitted under this subsection an estimate of the costs which will be incurred by the District of Columbia as a result of the enactment of the act in each of the first 4 fiscal years for which the act is in effect, together with a statement of the basis for such estimate.

### D.C. Code § 1-207.13. Transfer of personnel, property, and funds [Formerly § 1-212.1]

   (a) In each case of the transfer, by any provision of this chapter, of functions to the Council, to the Mayor, or to any agency or officer, there are hereby authorized to be transferred (as of the time of such transfer of functions) to the Council, to the Mayor, to such agency, or to the agency of which such officer is the head, for use in the administration of the functions of the Council or such agency or officer, the personnel

(except the Commissioner of the District of Columbia, the Assistant to the Commissioner, the Chairman of the District of Columbia Council, the Vice Chairman of the District of Columbia Council, the other members thereof, all of whose officers are abolished by this chapter), property, records, and unexpended balances of appropriations and other funds which relate primarily to the functions so transferred.

(b) If any question arises in connection with the carrying out of subsection (a) of this section, such questions shall be decided:

  (1) In the case of functions transferred from a Federal officer or agency, by the Director of the Office of Management and Budget; and

  (2) In the case of other functions (A) by the Council, or in such manner as the Council shall provide, if such functions are transferred to the Council, and (B) by the Mayor if such functions are transferred to him or to any other officer or agency.

(c) Any of the personnel authorized to be transferred to the Council, the Mayor, or any agency by this section which the Council or the head of such agency shall find to be in excess of the personnel necessary for the administration of its or his function shall, in accordance with law, be retransferred to other positions in the District or Federal Government or be separated from the service.

(d) No officer or employee shall, by reason of his transfer to the District government under this chapter or his separation from service under this chapter, be deprived of any civil service rights, benefits, and privileges held by him prior to such transfer or any right of appeal or review he may have by reason of his separation from service.


## D.C. Code § 1-611.03. Compensation policy; compensatory time off; overtime pay [Formerly § 1-612.3]

  (a) Compensation for all employees in the Career, Educational, Legal, Excepted, and the Management Supervisory Services shall be fixed in accordance with the following policy:

  (1) Compensation shall be competitive with that provided to other public sector employees having comparable duties, responsibilities, qualifications, and working conditions by occupational groups. For the purpose of this paragraph, compensation shall be deemed to be competitive if it falls reasonably within the range of compensation prevailing in the Washington, D.C., Standard Metropolitan Statistical Area (SMSA); provided, that compensation levels may be examined for public and/or private employees outside the area and/or for federal government employees when necessary to establish a reasonably representative statistical basis for compensation comparisons, or when conditions in the local labor market require a larger sampling of prevailing compensation levels.

(2) Pay for the various occupations and groups of employees shall be, to the maximum extent practicable, interrelated and equal for substantially equal work in accordance with this principle, dental officers shall be paid on the same schedule as medical officers having comparable qualifications and experiences.

(3) Differences in pay shall be maintained in keeping with differences in level of work and quality of performance.

(4) Repealed.

(5) Repealed.

(6) Repealed.

(7) (A) Any full-time permanent, indefinite, or term District government employee who serves in a reserve component of the United States Armed Forces and who has been or will be called to active duty as a result of Operation Enduring Freedom, or in preparation for or as a result of Operation Iraqi Freedom, shall receive, upon application and approval, an amount that equals the difference in compensation between the employee's District government basic pay reduced by the employee's basic military pay. This amount shall not be considered as basic pay for any purpose and shall be paid for any period following the formal inception of Operation Enduring Freedom in 2001, any period following the beginning of the preparation for Operation Iraqi Freedom in 2002 and 2003, or for any period following the formal inception of Operation Iraqi Freedom in 2003, during which the employee is carried in a non-pay status from the time the employee is called into active duty, until the employee is released from active duty occasioned by any of these military conflicts.

(B) The Mayor shall issue rules within 30 days of March 26, 2008, to implement the provisions of this subdivision (7).

(b) The pay of an individual receiving an annuity under any District government civilian retirement system selected for employment in the District government on or after January 1, 1980, shall be reduced by the amount of annuity allocable to the period of employment as a reemployed annuitant. No reduction shall be made to the pay of a reemployed individual for any retirement benefits received by the reemployed individual pursuant to 5 U.S.C.S. § 8331, D.C. Code §§ 1-626.03 through 1-626.12, § 5-723(e), the Judges' Retirement Fund, established by § 1-714, or the Retired Police Officer Public Schools Security Personnel Deployment Amendment Act of 1994.

(c) Repealed.

(d) Notwithstanding any other provisions of law or regulation, effective April 15, 1986, any employee who is covered by the provisions of the Fair Labor Standards Act of 1938 (29 U.S.C.S. § 201 et seq.) ("FLSA"), and is eligible to earn compensatory time may receive compensatory time off at a rate not less than 1 and one-half hours for each hour

of employment for which overtime compensation is required under the FLSA, in lieu of paid overtime compensation.

   (1) If the work of an employee for which compensatory time off may be provided includes work in a public safety activity, an emergency response activity, or a seasonal activity, the employee may accrue not more than 480 hours of compensatory time for hours worked after April 15, 1986. If the work of an employee does not include work in a public safety activity, an emergency response activity, or a seasonal activity, the employee may accrue not more than 240 hours of compensatory time for hours worked after April 15, 1986.

   (2) Any employee who, after April 15, 1986, has accrued the maximum number of hours of compensatory time off allowed under paragraph (1) of this subsection shall, for additional hours of work, be paid overtime compensation.

(e) Notwithstanding any other provision of District law or regulation, effective on the first day of the first pay period beginning one month after November 25, 1993, entitlement to and computation of overtime for all employees of the District government, except those covered by a collective bargaining agreement providing otherwise, shall be determined in accordance with, and shall not exceed, the overtime provisions of section 7 of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C.S. § 207. No person shall be entitled to overtime under this section unless that person is either entitled to overtime under the Fair Labor Standards Act or is entitled to overtime under the personnel rules of the District of Columbia as they existed at the time of enactment of this section.

(f) (1) Uniformed members of the Metropolitan Police Department at the rank of Inspector and above shall not receive overtime compensation for work performed in excess of a 40-hour administrative workweek, excluding rollcall.

   (2) (A) Except as provided in subparagraph (B) of this paragraph, uniformed members of the Fire and Emergency Medical Services Department at the rank of Assistant Fire Chief and above shall not receive overtime compensation for work performed in excess of 40 hours in an administrative workweek and in excess of 48 hours in a workweek for those uniformed members of the Fire and Emergency Medical Services Department at the rank of Assistant Fire Chief and above in the Firefighting Division.

   (B) For fiscal years 2011, 2012, and 2013, uniformed members of the Fire and Emergency Medical Services Department at the rank of Battalion Fire Chief and above shall not receive overtime compensation for work performed in excess of 40 hours in an administrative workweek and in excess of 48 hours in a workweek for those uniformed members of the Fire and Emergency Medical Services Department at the rank of Battalion Fire Chief and above in the Firefighting Division.

   (3) Uniformed members of the Metropolitan Police Department at the rank of Inspector and above and uniformed members of the Fire and Emergency Medical Services Department at the rank of Assistant Fire Chief and above shall not be suspended for

disciplinary actions for less than a full pay period.

(4) (A) For fiscal years 2011, 2012, and 2013, and except as provided in subparagraph (B) of this paragraph, no officer or member of the Fire and Emergency Medical Services Department who is authorized to receive overtime compensation under this subsection may earn overtime in excess of $ 20,000 in a fiscal year.

(B) This paragraph shall not apply to a member of the Fire and Emergency Medical Services Department who is classified as a Heavy Mobile Equipment Mechanic or a Fire Arson Investigator Armed (Canine Handler).

(C) Notwithstanding any other provision of this paragraph, the exemption to the overtime limitation for the Fire Arson Investigator Armed (Canine Handler) set forth in subparagraph (B) of this paragraph shall apply retroactively to fiscal year 2011.

### D.C. Code § 1-803.01. Obligation of federal government to make benefit payments [Formerly § 1-762.1]

(a) In general. -- In accordance with the provisions of this chapter, the federal government shall make federal benefit payments associated with the pension plans for police officers, firefighters, and teachers of the District of Columbia.

(b) No reversion of federal responsibility to District. -- At no point after the effective date of this chapter may the responsibility or any part thereof assigned to the federal government under subsection (a) of this section for making federal benefit payments revert to the District of Columbia.

### D.C. Code § 1-815.01. Judicial review [Formerly § 1-768.1]

(a) In general. -- A civil action may be brought:

(1) By a participant or beneficiary to enforce or clarify rights to benefits from the Trust Fund or Federal Supplemental Fund under this chapter;

(2) By the Trustee:

(A) To enforce any claim arising (in whole or in part) under this chapter or the contract; or

(B) To recover benefits improperly paid from the Trust Fund or Federal Supplemental Fund or to clarify a participant's or beneficiary's rights to benefits from the Trust Fund or Federal Supplemental Fund; and

(3) By the Secretary to enforce any provision of this chapter or the contract.

51

(b) Treatment of Trust Fund. -- The Trust Fund may sue and be sued as an entity.

(c) Exclusive remedy. -- This subchapter shall be the exclusive means for bringing actions against the Trust Fund, the Trustee, or the Secretary under this chapter.


## D.C. Code § 1-815.02. Jurisdiction and venue [Formerly § 1-768.2]

(a) In general. -- The United States District Court for the District of Columbia shall have exclusive jurisdiction and venue, regardless of the amount in controversy, of:

(1) Civil actions brought by participants or beneficiaries pursuant to this chapter, and

(2) Any other action otherwise arising (in whole or part) under this chapter or the contract.

(b) Review by Court of Appeals. -- Notwithstanding any other provision of law, any order of the United States District Court for the District of Columbia issued pursuant to an action described in subsection (a) of this section that concerns the validity or enforceability of any provision of this chapter or seeks injunctive relief against the Secretary or Trustee under this chapter shall be reviewable only pursuant to a notice of appeal to the United States Court of Appeals for the District of Columbia Circuit.

(c) Review by Supreme Court. -- Notwithstanding any other provision of law, review by the Supreme Court of the United States of a decision of the Court of Appeals that is issued pursuant to subsection (b) of this section may be had only if the petition for relief is filed within 20 calendar days after the entry of such decision.

(d) Restrictions on declaratory or injunctive relief. -- No order of any court granting declaratory or injunctive relief against the Secretary or the Trustee shall take effect during the pendency of the action before such court, during the time an appeal may be taken, or (if an appeal is taken or petition for certiorari filed) during the period before the court has entered its final order disposing of the action.


## D.C. Code § 5-701. Definitions [Formerly § 4-607]

Wherever used in this subchapter:

(1) The term "member" means any officer or member of the Metropolitan Police force, of the Fire Department of the District of Columbia, of the United States Park Police force, of the United States Secret Service Uniformed Division, and any officer or member of the United States Secret Service Division to whom this subchapter shall apply, but does not include an officer or member of the United States Park Police force, of the

United States Secret Service Uniformed Division, or of the United States Secret Service Division, whose service is employment for the purposes of title II of the Social Security Act and chapter 21 of the Internal Revenue Code of 1986, and who is not excluded from coverage under chapter 84 of title 5, United States Code, by operation of § 8402 of such title.

   (2) The terms "disabled" and "disability" mean disabled for useful and efficient service in the grade or class of position last occupied by the member by reason of disease or injury, not due to vicious habits or intemperance as determined by the Board of Police and Fire Surgeons, or willful misconduct on his part as determined by the Mayor.

   (3) The term "widow" means the surviving wife of a member or former member if:

   (A) She was married to such member or former member:

      (i) While he was a member; or

      (ii) For at least 1 year immediately preceding his death; or

   (B) She is the mother of issue by such marriage.

   (4) The term "widower" means the surviving husband of a member or former member if, in the case of a member who was an officer or member of the United States Park Police force, the United States Secret Service Uniformed Division, or the United States Secret Service Division, or the surviving husband of a member or former member who was a member or officer of the Metropolitan Police force or the Fire Department of the District of Columbia if:

   (A) He was married to such member or former member:

      (i) While she was a member; or

      (ii) For at least 1 year immediately preceding her death; or

   (B) He is the father of issue by such marriage.

   (5) (A) The term "child" means an unmarried child, including:

      (i) An adopted child; and

      (ii) A stepchild or recognized natural child who lives with the member in a regular parent-child relationship, under the age of 18 years; or

      (iii) Such unmarried child regardless of age who, because of physical or mental disability incurred before the age of 18, is incapable of self-support.

53

(B) The term "student child" means an unmarried child who is a student between the ages of 18 and 22 years, inclusive, and who is regularly pursuing a full-time course of study or training in residence in a high school, trade school, technical or vocational institute, junior college, college, university, or comparable recognized educational institution.

(6) The term "basic salary" means regular salary established by law or regulation, including any differential for special occupational assignment, but shall not include overtime, holiday, or military pay.

(7) The term "annuitant" means any former member who, on the basis of his service, has met all requirements of this subchapter for title to annuity and has filed claim therefor.

(8) The term "survivor" means a person who is entitled to annuity under this subchapter based on the service of a deceased member or of a deceased annuitant.

(9) The term "survivor annuitant" means a survivor who has filed claim for annuity.

(10) The term "police or fire service" means all honorable service in the Metropolitan Police Department, United States Secret Service Uniformed Division, Fire Department of the District of Columbia, the United States Park Police force, and the United States Secret Service Division coming under the provisions of this subchapter.

(11) The term "military service" means honorable active service in the Army, Navy, Air Force, Marine Corps, or Coast Guard of the United States, but shall not include service in the National Guard except when ordered to active duty in the service of the United States.

(12) The term "Mayor" means the Mayor of the District of Columbia or his designated agent or agents.

(13) The term "service" means employment which is creditable under § 5-704.

(14) The term "government" means the executive, judicial, and legislative branches of the United States government, including government owned or controlled corporations and Gallaudet College, and the municipal government of the District of Columbia.

(15) The term "government service" means honorable active service in the executive, judicial, or legislative branches of the United States government, including government owned or controlled corporations, and Gallaudet College, and the municipal government of the District of Columbia, and for which retirement deductions, other than social security deductions, were made.

(16) The term "department" means any part of the executive branch of the United States government, or any part of the government of the District of Columbia whose members come under this subchapter.

   (17) The term "average pay" means the highest annual rate resulting from averaging the member's rates of basic salary in effect over any 36 consecutive months of police or fire service in the case of a member who is an officer or member of the Metropolitan Police force or the Fire Department of the District of Columbia and who first becomes such a member after the end of the 90-day period beginning on November 17, 1979, or over any 12 consecutive months of police or fire service in the case of any other member, with each rate weighted by the time it was in effect, except that if the member retires under § 5-710 and if on the date of his retirement under the section he has not completed 12 consecutive months or 36 consecutive months, as the case may be, of police or fire service, such term means his basic salary at the time of his retirement.

   (18) The term "adjusted average pay" means the average pay of a member who was an officer or member of the United States Secret Service Uniformed Division, the United States Secret Service Division, the Metropolitan Police force or the Fire Department of the District of Columbia increased by the per centum increase (adjusted to the nearest one tenth of 1%) in the Consumer Price Index for All Urban Consumers, published by the Bureau of Labor Statistics, between the month in which such member retires and the month immediately prior to the month in which such member dies; except that in the case of members hired on or after the first day of the first pay period that begins after October 29, 1996, the increase shall not exceed 3% per annum.

   (19) The term "full range of duties" means the ability of a sworn member of the Metropolitan Police Department or the Fire and Emergency Medical Services Department to perform all of the essential functions of police work or fire suppression as determined by the established policies and procedures of the Metropolitan Police Department or the Fire and Emergency Medical Services Department and to meet the physical examination and physical agility standards established under §§ 5-107.02a and 5-451.


**D.C. Code § 5-723. Accruement and payment of annuities; persons who may accept payment; waiver; reduction [Formerly § 4-629]**

…

(e) Notwithstanding any other provision of law, the salary of any annuitant who first becomes entitled to an annuity under this subchapter, after November 17, 1979, and who is subsequently employed by the government of the District of Columbia shall be reduced by such amount as is necessary to provide that the sum of such annuitant's annuity under this subchapter and compensation for such employment is equal to the salary otherwise payable for the position held by such annuitant. The provisions of this subsection shall not apply to an annuitant employed by the District of Columbia government under the Retired Police Officer Redeployment Amendment Act of 1992 or the Detective Adviser Act of 2004. The provisions of this subsection shall not apply to an annuitant employed by the D.C. Public Schools under the Retired Police Officer Public Schools Security Personnel Deployment Amendment Act of 1994.

## Certificate of Compliance with Rule 32(a)

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,452 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using OpenOffice Writer in Times New Roman 14 point font.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that two copies of the foregoing Opening Brief and Joint Appendix were served via Appellate ECF and via United States Postal Service Priority Mail, postage prepaid, to the District of Columbia Solicitor General, this 27th day of August, 2014.

_____
Matthew LeFande